### GIBBS–BROWER INTERNATIONAL, Plaintiff,

v.

### KIRCHHEIMER BROTHERS CO. and Joe DeJure, Defendants.

No. 84 C 5174.

United States District Court,
N.D. Illinois, E.D.

May 10, 1985.

---

Irwin I. Zatz, Chicago, Ill., for plaintiff.

Herbert H. Victor, Chicago, Ill., and Barry R. Fertel, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Gibbs-Brower International ("Gibbs-Brower") initially sued Kirchheimer Brothers Co. ("Kirchheimer") and sole Kerchheimer stockholder Joe DeJure ("DeJure"), seeking to recover a commission and finder's fee as the result of DeJure's sale of all the outstanding shares of Kirchheimer stock to Canover Industries, Inc. ("Canover"). Kirchheimer and DeJure then filed counterclaims against Gibbs-Brower alleging defamation. DeJure has now moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment on Gibbs-Brower's claim for a reasonable finder's fee based on Canover's purchase of the Kirchheimer stock.[1] Gibbs-Brower asks summary judgment against both defendants on their counterclaims. For the reasons stated in this memorandum opinion and order:

1. DeJure's motion is granted.

2. DeJure's counterclaims are dismissed with prejudice by agreement.

3. Gibbs-Brower's motion is granted in part and denied in part as to Kirchheimer's counterclaims.

### Facts [2]

In December 1983 Kirchheimer, a manufacturer of bags, cartons and other forms of packaging, decided to close its manufacturing facility in Schiller Park, Illinois and to sell the machinery and equipment thus removed from service. In late December Gibbs-Brower, a corporation engaged in the business of buying and selling industrial and manufacturing machinery, proposed to handle the sale of the Schiller Park machinery for Kirchheimer. Following a number of meetings between DeJure (acting for Kirchheimer) and Gibbs-Brower representative James Crosset, the corporations entered into a January 27, 1984 Exclusive Sales Agreement (the "Agreement").

Under the Agreement Gibbs-Brower was to advertise and promote the Kirchheimer machinery worldwide, such efforts to include "all means deemed necessary and appropriate by Gibbs-Brower International" (Complaint Ex. A). In addition Gibbs-Brower was to negotiate any sale it procured and then forward all payments it received to Kirchheimer.[3] Kirchheimer, in turn, gave Gibbs-Brower the exclusive right to sell the machinery for a three-month period beginning the date of the Agreement and ending April 27, 1984. As is customary in such exclusive brokerage arrangements, Kirchheimer agreed to pay a commission to Gibbs-Brower for any equipment sale made during the term of the Agreement, whether initiated by Gibbs-Brower or by Kirchheimer personnel.[4]

During January Gibbs-Brower sold two pieces of the Kirchheimer equipment, forwarding the proceeds (less Gibbs-Brower's

---

1. That motion does not address Gibbs-Brower's commission claim against Kirchheimer, described later in this opinion.

2. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovant. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984). In a situation like this, where each litigant has filed a Rule 56 motion, the court may be called on to take a double perspective on certain facts (those as to which an inference might reasonably be drawn either way). This section states matters in conformity with the principles just outlined. To the extent the parties seek to controvert the facts as so stated, the later text discussion deals with their contentions.

3. Gibbs-Brower appraised the Kirchheimer machinery and set an asking price that included its commission.

4. Also as frequently occurs in such transactions, sales to any of four designated purchasers (prospects who antedated Gibbs-Brower's involvement in the matter) were specifically excluded from the payment of commissions under the Agreement.

commission) to Kirchheimer. Late in the same month Canover approached Kirchheimer about the remaining machinery after having been told of its availability by Gibbs-Brower. Canover official Al Eisenberg ("Eisenberg") visited Schiller Park to inspect the Kirchheimer equipment. Over the course of several additional visits Canover became interested in buying Kirchheimer's entire business operation rather than just the machinery. Negotiations between Canover and Kirchheimer continued, without the participation of Gibbs-Brower, until on March 8 Canover agreed to purchase all outstanding shares of Kirchheimer stock (Kirchheimer told Gibbs-Brower of its agreement with Canover on the same date).

During the course of the Kirchheimer-Canover negotiations, Gibbs-Brower was at work preparing a marketing brochure describing the Kirchheimer machinery. On March 7 the marketing brochure was mailed to prospective purchasers worldwide. Its cover described the machinery in general terms, making reference to its good condition and low price, and also bore the following statement in block letters:

KIRCHHEIMER BROTHERS HAS CLOSED ITS ULTRA–MODERN CHICAGO PLANT! AND ... ALL MACHINERY MUST BE SOLD.

Kirchheimer became aware of the brochure March 9. DeJure immediately telephoned Gibbs-Brower to complain that the quoted statement gave the clear impression Kirchheimer was going out of the paper business altogether. On the same day Gibbs-Brower sent telegrams to the recipients of its brochure, correcting any misimpression created by the cover statement and saying the Kirchheimer machinery was no longer on the market (DeJure Aff. Ex. A):

We wish to correct the statements made in our previous letter to you.

Kirchheimer Brothers Corporation is continuing its business and operations and merely intended to sell certain machinery and equipment.

The Company has withdrawn such machinery and equipment for sale, as it will be continuing its manufacturing and operations as conducted in the past.

*Gibbs-Brower's Claims Against DeJure*

Gibbs-Brower wants to charge Kirchheimer commission, calculated under the Agreement, on the sale of the machinery to Canover (as subsumed within the stock transaction). Gibbs-Brower's claim against DeJure, by contrast, sounds in quantum meruit and seeks to recover a reasonable finder's fee on the entire sale price of Kirchheimer stock to Canover. In that respect Gibbs-Brower asserts its tendering of Canover as a purchaser for the Kirchheimer machinery was also the procuring cause of DeJure's ultimate sale of the Kirchheimer stock to Canover. According to Gibbs-Brower Mem. 6:

DeJure could reasonably have been expected to know—that if he sold more than just the machinery—he would be expected to pay for all of the benefits he received. Gibbs-Brower made known to DeJure that it expected to be compensated for all of its services.

In pressing for summary judgment on that claim DeJure argues:

1. New York law, which does not recognize claims in quantum meruit, applies to the Agreement.

2. DeJure did not reasonably believe Gibbs-Brower expected a fee on the stock sale.

3. Gibbs-Brower's claim with respect to the stock sale is an attempt to expand its business advantage beyond the express terms of the Agreement.

Those contentions—a mixed bag at best— will be considered in turn.

■ DeJure's first contention is altogether without merit. It says New York law applies because Gibbs-Brower is a New York corporation and because the Agreement was prepared on Gibbs-Brower stationery. Not surprisingly, DeJure cites no authority for that novel idea.

*Klaxon Corp. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941) calls for the use of Illinois choice-of-law rules to determine the applicable substantive law. Research has uncovered no Illinois case addressing—let alone deciding—what conflict rule applies in quantum meruit or unjust enrichment cases. But as the *Restatement (Second) of Conflict of Laws 2d* § 221 (1971) suggests, unjust enrichment cases fall somewhere between contract and tort. Illinois' well-established rule in tort cases, first announced in *Ingersoll v. Klein,* 46 Ill.2d 42, 48, 262 N.E.2d 593, 596 (1970), requires the court to look to the law of the state having the "most significant contacts" with the challenged conduct. In contract cases Illinois has traditionally looked primarily to the law of the place of performance. More recently, however, there has been some evidence of movement toward a "center of gravity" approach similar to the *Ingersoll* tort-case doctrine. See *Overseas Development DISC Corp. v. Sangamo Construction Co.,* 686 F.2d 498, 510–11 n. 43 (7th Cir.1982); *WICO Corp. v. Willis Industries,* 567 F.Supp. 352, 355 n. 4 (N.D.Ill.1983).

█ In light of the clear *Ingersoll* tort-case rule and the like trend in contract cases, this Court concludes (as did *Overseas Development,* 686 F.2d at 511) Illinois would apply the "most significant relationship" concept to quantum meruit claims too. That approach would plainly point to the substantive law of Illinois:

1. Gibbs-Brower sent a representative to Illinois on several occasions to propose and then negotiate the Agreement.

2. All negotiations between Kirchheimer and Canover took place in Illinois.

3. Kirchheimer, the sale of whose stock underlies the claim, is an Illinois-based corporation.

Indeed the only arguable link to New York is Gibbs-Brower's incorporation there—and even that contact is minimal, given the location of Gibbs-Brower's general offices

and principal place of business in Danbury, Connecticut (Gibbs-Brower Vice President William Schwartz ("Schwartz") Feb. 27, 1985 Aff. ¶ 2).

In short the events giving rise to Gibbs-Brower's unjust enrichment claim are centered in Illinois. Illinois' substantive law of quantum meruit must apply.

█ DeJure's second argument reflects a principle well-established in Illinois law (*Plastics & Equipment Sales Co. v. DeSoto, Inc.,* 91 Ill.App.3d 1011, 1017, 91 Ill.Dec. 487, 493, 415 N.E.2d 492, 498 (1st Dist. 1980) (emphasis added) ):

> A *quantum meruit* recovery requires a showing that a defendant has *voluntarily* accepted a benefit which would be inequitable for him to retain without payment since the law implies a promise to pay reasonable compensation when valuable services are *knowingly* accepted.

It follows such equitable relief is not available where "the plaintiff did not contemplate a fee at the time the services were rendered, or the defendant could not have reasonably believed that plaintiff expected a fee" (*id.*).

█ DeJure's affidavit avows his dealings with Gibbs-Brower before the parties entered into the Agreement focused exclusively on the machinery and equipment, with no discussion of the possibility of selling Kirchheimer as a going concern. Gibbs-Brower's own marketing brochure dealt only with the machinery and plainly anticipated its piecemeal sale. Consequently when a Canover official came to inspect the machinery DeJure had no inkling he might be interested in Kirchheimer as a going business (DeJure Aff. ¶ 9). There is no room for any inference that either Gibbs-Brower nor Kirchheimer contemplated the sale of Kirchheimer as a business, nor has Gibbs-Brower provided any evidence it engages in brokering businesses as well as the buying and selling of machinery.[5] It is scarcely surprising that DeJure Mar. 25, 1985 Aff. ¶ 6 states:

---

**5.** In fact a meeting was held in April 1984 among Gibbs-Brower and counsel for Canover

and DeJure to discuss Gibbs-Brower's rights in light of the sale of Kirchheimer as a business.

During all meetings and telephone calls between myself and officers and salesmen of Gibbs-Brower, no mention was made about my possible charge or fee to me personally for any contingency that may occur.

Against that cumulative showing, Gibbs-Brower offers only the statement (Schwartz Aff. ¶ 4):

Gibbs-Brower in all its dealings with Kirchheimer made known to DeJure that it expected to be compensated for all services it rendered.

That generalization does not meet Gibbs-Brower's burden under Rule 56(e) to come forward with specific evidence to rebut DeJure's showing.[6] All the evidence shows both parties contemplated the "services [to be] rendered" by Gibbs-Brower embraced only the sale of the Kirchheimer machinery. Gibbs-Brower surely has not raised a genuine factual question as to whether DeJure could reasonably have believed Gibbs-Brower expected a fee on the sale of stock.

▬ Even were there room to doubt that conclusion about the parties' reasonable expectations (as there is not), DeJure would still be entitled to summary judgment on the strength of its third argument. Illinois cases generally bar a litigant's resort to quantum meruit to gain for himself an advantage not contemplated by the parties to the transaction. That principle informs the preceding discussion of whether in the circumstances DeJure reasonably believed Gibbs-Brower expected a finder's fee on the stock—and it also stands behind the general rule (*Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill.App.3d 357, 360, 60 Ill.Dec. 100, 103, 432 N.E.2d 999, 1002 (1st Dist. 1982) ):

that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.

▬ In part that rule guards against the use of quantum meruit to distort a negotiated arrangement by broadening the scope of the contract. As *Industrial Lift Truck, id.* at 361, 60 Ill.Dec. at 104, 432 N.E.2d at 1002 put it:

If a quasi-contract action could be brought every time a party under contract performs a service not precisely covered by the contract, then the rule preventing quasi-contract actions when a contract exists would have little meaning. Parties to a contract often perform services not expressly demanded by the contract. They do so to enhance their position under the contract and not because they expect a different remuneration for those services from what they could receive under the contract.

This case really follows a fortiori from that proposition. After all Gibbs-Brower provided *no* service beyond that called for in the contract: It simply produced a prospective purchaser for the machinery (though, in fairness, it was willing to involve itself in the negotiations if needed). Even less justification exists, then, for it to share in the incidental and unexpected consequence of Canover's later-developed interest in the Kirchheimer business as a whole: its distribution business, its interest in any real estate, its good will. Gibbs-Brower cannot, therefore, fairly lay claim to a windfall share of that wholly incidental benefit.

Two independent—and independently sufficient—reasons thus exist for a summary judgment rejecting Gibbs-Brower's claim against DeJure for a finder's fee on the sale of the Kirchheimer stock. That claim is out of the case.

### Counterclaims Against Gibbs-Brower

▬ Kirchheimer and DeJure have advanced three counterclaims against Gibbs-Brower, all stemming from the allegedly

---

Their discussion focused only on any commission payable on the machinery, with nothing said about a fee based on the sale of stock (Victor Aff. ¶ 6).

**6.** Gibbs-Brower's responsive memorandum consistently refers to allegations in its Complaint— but Rule 56(e) bars consideration of those allegations in opposition to the current motion.

false and defamatory statement on the cover of the marketing brochure:

1. Counterclaim I purports to state a cause of action for defamation, alleging special damages in the amount of $228,000.

2. Counterclaim II claims Gibbs-Brower's distribution of the defamatory brochure constituted a breach of the Agreement.

3. Counterclaim III, sounding in negligence, alleges distribution of the defamatory brochure breached Gibbs-Brower's duty to Kirchheimer to distribute a truthful brochure.

Because Gibbs-Brower Mem. 7–8 accurately pointed out DeJure (not named in the brochure at all) was not "the real party in interest" (Rule 17(a)) on those claims, Kirchheimer Mem. 1 n. * has accepted dismissal of the claims as to DeJure. As for the Kirchheimer claim, Gibbs-Brower retorts by saying the statement was not defamatory at all.

Kirchheimer Mem. 5 acknowledges the marketing brochure statement was not libelous *per se* under the "reasonable innocent construction" rule[7] of *Chapski v. Copley Press*, 92 Ill.2d 344, 351–52, 65 Ill. Dec. 884, 887–88, 442 N.E.2d 195, 198–99 (1982). Instead Kirchheimer claims the statement was libelous *per quod* (*Audition Division, Ltd. v. Better Business Bureau of Metropolitan Chicago, Inc.*, 120 Ill. App.3d 254, 258, 75 Ill.Dec. 947, 951, 458 N.E.2d 115, 119 (1st Dist.1983)):

An action for libel *per quod* is established where a publication not libelous on its face is rendered defamatory by extrinsic facts or innuendo and special damages are proved.

That means Gibbs-Brower must prevail on the defamation counterclaim unless Kirchheimer can offer evidence to indicate (1) the brochure was rendered defamatory by extrinsic facts and (2) it suffered special damages.

In support of its summary judgment motion Gibbs-Brower offers Crosset's account of his discussions with DeJure (Crosset Aff. ¶ 4):

On or about January 16, 1984 I met with Mr. DeJure at Chicago, Illinois. Mr. DeJure said he is closing the production facility, selling all of the machinery and then continuing in business as a distributor.

DeJure, however, flatly denies that account (DeJure Aff. ¶ 3):

On or about December 15, 1983 negotiations commenced between myself and Gibbs-Brower International ("GBI") concerning the sale of machinery owned by [Kirchheimer] on or about January 16, 1984. The representative of GBI, James Crosset met with me to discuss the sale of such equipment. Neither during that meeting, nor thereafter, did I ever say that the production facility would close.

Yet the brochure affirmatively stated in block letters that the Schiller Park facility "has closed." On DeJure's evidence, which the Crosset statement does not really contradict (and which this Court must credit on Gibbs-Brower's Rule 56 motion), the brochure statement was false.[8] And being false, the statement may well have been defamatory. According to DeJure Aff. ¶ 11, it was widely known in the industry Kirchheimer had only one manufacturing facility. Gibbs-Brower's announcement of the facility's closing, therefore, at least "intimated that [Kirchheimer] was going out

---

**7.** That renders unnecessary any ruling on whether the publication could meet the standard for corporate defamation on its face (*Garber-Pierre Food Products, Inc. v. Crooks*, 78 Ill. App.3d 356, 360, 33 Ill.Dec. 878, 881, 397 N.E.2d 211, 214 (1st Dist.1979)):

[T]he alleged defamation must assail the corporation's financial position or business methods, or accuse it of fraud or mismanagement. See also *Audition Division*, 120 Ill.App.3d at 256, 75 Ill.Dec. at 954, 458 N.E.2d at 118. Examina-

tion of the brochure against that standard demonstrates the soundness of Kirchheimer's concession.

**8.** This is not of course a *finding* of falsity. It rather reflects a genuine dispute as to truth or falsity (clearly a material fact). Whether DeJure's version is consistent with Kirchheimer's acknowledged decision to sell all its machinery is for the factfinder to decide later.

of the paper business." To that extent the brochure conveyed a false impression of Kirchheimer to the industry—a false impression that had the potential adversely to affect Kirchheimer's business.

Kirchheimer's only effort to "prove" special damages is in DeJure Aff. ¶ 13:

> As a result of plaintiff's deflamatory [sic] brochure which was produced as a result of GBI's gross negligence, KBC lost a great deal of business. As noted in the amended answer, KBC has lost at least $247,000 in business. Specifically, KBC prior to the distribution of the brochure, did approximately $300,000 per year in business with Edison Brothers, but after the brochure was distributed, then Edison believed that KBC was going out of business, and the volume of KBC's business with Edison Brothers dropped by over $200,000. In addition, we lost an account with Puritan Clothing which was approximately $20,000 as well as an account with Beloit for $7,000. Obviously, in this competitive industry when one of our competitors views a brochure purportedly produced by KBC that KBC "is closing its only facility," that competitor would use such a brochure to divert KBC business to a competitor. That is what occurred in this case, and KBC suffered significant damages as a result.

But that simply ignores Rule 56(e)'s requirement that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Summary judgment is a substitute for *trial*, available when no material facts are in dispute. At trial DeJure could not testify about what someone else believed, nor could he indulge the generalized and conclusory statements that pervade the quoted language. No more can he do so by a Rule 56 affidavit.

Because Kirchheimer has thus not met its burden as to one element of its libel *per quod* claim, Gibbs-Brower's motion as to that claim is granted. Only because Gibbs-Brower has obviously (though without any justifiable reason) mistaken its Rule 56(e) responsibility, this ruling is without prejudice to Kirchheimer's expeditious renewal of its claim *if* supported with a prima facie *factual* showing of special damages.

■ Kirchheimer's second and third counterclaims, sounding in contract and negligence, are also founded upon the proposition that the brochure statement was false and defamatory. But where Gibbs-Brower goes awry is in urging that common element means all the claims must stand or fall together.

Kirchheimer's breach of contract claim, simply stated, is that Gibbs-Brower distributed a false brochure and thus breached the Agreement. As *Colgan v. Rae-Ann Electric Co.*, 91 Ill.App.3d 386, 390, 47 Ill. Dec. 227, 230, 414 N.E.2d 1343, 1346 (3d Dist.1980) teaches:

> Engrafted on every written contract are the customs, practices and definitions which are commonly understood and accepted by the parties.

At this stage it is enough to conclude one such implied term could be the understanding that Gibbs-Brower would not publish false information about Kirchheimer in the course of procuring buyers for the machinery. In view of the genuine dispute as to whether the brochure was true or false, Gibbs-Brower may therefore have been in breach of its obligation under the Agreement. Its motion must be denied as to Kirchheimer's second counterclaim.

Kirchheimer's third counterclaim is really a restatement in tort of its second counterclaim, for it turns on the allegation Gibbs-Brower was negligent in distributing a false brochure and thereby breached its duty to use reasonable care in preparing and distributing the brochure. That duty, of course, arose from the actual and implied terms of the Agreement. Thus the third counterclaim survives just as the second has.

### Conclusion

There is no genuine issue of material fact, and DeJure is entitled to a judgment

as a matter of law, on Gibbs-Brower's claim against DeJure for a finder's fee on the sale of the Kirchheimer stock. That claim is dismissed with prejudice.

By agreement of the parties, DeJure's counterclaims against Gibbs-Brower are also dismissed with prejudice. As for Kirchheimer's counterclaims against Gibbs-Brower:

1. There is no genuine issue of material fact, and Gibbs-Brower is entitled to a judgment as a matter of law, on Kirchheimer's defamation claim (subject to the possibility of its renewal discussed earlier in this opinion).

2. Gibbs-Brower's motion for summary judgment is denied as to Kirchheimer's contract and negligence claims.

