GARBER-PIERRE FOOD PRODUCTS, INC., Plaintiff-Appellee, *v.*
CLARENCE J. CROOKS, Defendant-Appellant.

First District (3rd Division)   No. 79-75

Opinion filed November 14, 1979.

Ralph G. Scheu, of Chicago, for appellant.

Lipnick, Barsy & Joseph, of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

This matter arises out of an action for libel per se brought by plaintiff, Garber-Pierre Food Products, Inc., an Illinois corporation, against defendant, Clarence J. Crooks, for statements contained in a letter written by defendant. After the trial court granted summary judgment as to liability in favor of plaintiff, a jury returned a verdict assessing punitive

damages in the sum of $20,000, and the court entered judgment on the verdict. Defendant appeals.

Plaintiff, a food wholesaler, was a supplier and creditor of Hamlin House, Inc., a nursing home. Defendant represented Hamlin in a bankruptcy proceeding. On April 21, 1977, plaintiff's attorney wrote to the bankruptcy judge, the attorney for the creditors' committee, and defendant. In the letter, plaintiff resigned from the creditors' committee and stated that it had stopped dealing with Hamlin because the debtor was unable to pay for products bought and delivered. In response, on May 4, 1977, defendant wrote the following letter:

"Dear Mr. Chatz:

On behalf of the Debtor-in-Possession, please consider this letter as a response of the true and accurate facts of the situation of the facility in contrast with the distortions and inaccuracies as presented by the Attorney for the GARBER-PIERRE FOOD PRODUCTS, INC. on April 24, 1977.

The facts are very simple. The Debtor-in-Possession refused to be blackmailed, extorted or gouged. The Debtor-in-Possession was advised that GARBER-PIERRE FOODS would only make C.O.D. deliveries.

The Debtor-in-Possession advised the creditor that credit of not more than thirty days would be required. The Creditor refused to make such deliveries. Thereupon the Debtor-in-Possession contacted another creditor or supplier who agreed to credit extension. In addition thereto, the prices charged Debtor-in-Possession by the subsequent replacement supplier was less than was being charged by GARBER-PIERRE FOODS.

I should indicate and suggest that other creditors have attempted to blackmail the facility. They have felt that due to the fact that they have been dealing with the facility for a substantial period of years, the facility had no other alternative except to deal with them exclusively. Some of these creditors, not all, have charged prices higher than what we have found their competitors have charged the facility. Therefore, in good conscience, we felt that we could not continue doing business with such creditors and have changed when it has been economically profitable for the facility to do so.

We recognize and appreciate that unless we maintain the good will of the creditors of the facility, the facility will not survive. In addition thereto, without the good will of the creditors, the facility would not have existed as long as it has. However, I think you will agree, that blackmail and extortion is not a course of action which the facility must except [*sic*] without question.

I trust the creditor, GARBER-PIERRE FOOD PRODUCTS, INC., will reconsider it's [*sic*] position. However, in the event it doesn't do so, I still think the facility will develop an adequate and satisfactory plan for payment for all of its creditors.

Very truly yours,

CLARENCE J. CROOKS

CJC/mrb

cc: The Honorable Richard L. Merrick
Garber-Pierre Food Products, Inc.
Ralph G. Scheu
Norbert Teclaw
Dave Taylor
J. Jeffrey Underwood
Dave Rennie
Alfred Portis"

On June 9, 1977, plaintiff filed its complaint alleging that the foregoing letter was libelous per se. It charged that defendant's letter accused plaintiff of committing the felonies of blackmail and extortion under Federal law, and that defendant knew these allegations were false. Plaintiff prayed for judgment in the sum of $1,000,000.

On July 8, 1977, defendant filed a motion for summary judgment arguing that his remarks were privileged as part of matters in controversy in the judicial proceedings for bankruptcy. Plaintiff filed an answer and a countermotion for summary judgment asserting that defendant's motion constituted an admission of publication and of facts well pleaded in the complaint. On October 13, 1977, Judge Paul F. Elward denied defendant's motion for summary judgment and granted plaintiff's countermotion for summary judgment on the issue of liability. Defendant filed a motion to vacate that order, arguing that his motion for summary judgment was actually in the nature of a motion to dismiss, and that by granting plaintiff's countermotion, the trial court denied defendant the right to file an answer and raise defenses to the complaint. Plaintiff filed an answer to defendant's motion. On January 25, 1978, the trial court denied defendant's motion to vacate the grant of summary judgment on the issue of liability.

On August 25, 1978, the matter was assigned to Judge James L. Griffin for a determination of punitive damages by a jury. Testimony at trial was minimal. Defendant testified that he wrote the letter at the request of the bankruptcy judge that defendant respond to the letter written by plaintiff's attorney. The president of plaintiff corporation testified as to the nature of its business. Among other instructions given, the jury was informed that plaintiff was not claiming any pecuniary loss or

special damages as a result of the letter, but was asking punitive damages solely. The jury was told they were required to assess damages in any amount between zero and one million dollars. The latter figure was set because it was the amount sought in the ad damnum.

On appeal, defendant contends that the publication cannot be deemed libelous; that the allegedly defamatory statements were privileged since they were made in connection with pending judicial proceedings; that punitive damages are constitutionally barred in libel actions and are not recoverable unless actual damages are proved; that the award of summary judgment was improper and that defendant did not receive a constitutionally fair trial.

Defendant contends that under constitutional standards and the Illinois innocent construction rule, the language contained in his letter does not constitute libel per se. Several classes of words are considered to be libelous per se. Among those categories are words imputing the commission of a criminal offense and words prejudicing a particular party in his profession or trade. *Weber v. Woods* (1975), 31 Ill. App. 3d 122, 334 N.E.2d 857; *Coursey v. Greater Niles Township Publishing Corp.* (1967), 82 Ill. App. 2d 76, 227 N.E.2d 164, *aff'd* (1968), 40 Ill. 2d 257, 239 N.E.2d 837.

■■ To determine whether comments are actionable per se, Illinois courts apply the innocent construction rule which requires that the letter "is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law." (*John v. Tribune Co.* (1962), 24 Ill. 2d 437, 442, 181 N.E.2d 105.) Whether the statement complained of is susceptible of innocent construction is a question of law to be resolved by viewing the statement "'stripped of innuendo.'" *Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 348, 243 N.E.2d 217.

In its complaint, plaintiff charged that defendant's letter accused plaintiff of the commission of the crimes of "blackmail" and "extortion" under Federal law. A similar situation was addressed in *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler* (1970), 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537. There, a real estate developer was involved in negotiations with the city council. The local newspaper published two articles in which it reported that some people at public meetings had characterized the developer's negotiating stance as "blackmail." The developer complained that by use of the term "blackmail," the newspaper was charging him with a crime, and that since the newspaper knew he had not committed such a crime, it should be held liable for the knowing use of a falsehood. The Supreme Court concluded that as a matter of constitutional law, the word "blackmail" in these circumstances was not libel. In so holding, the court stated:

"It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." 398 U.S. 6, 14, 26 L. Ed. 2d 6, 15, 90 S. Ct. 1537.

■■ Similarly, in the present case, we believe that the words "blackmail" and "extortion" are capable of innocent construction. When read within the context of the entire letter, these words do not impute the commission of a crime, but rather reflect defendant's belief that plaintiff's negotiating position concerning the payment for goods was unreasonable. The primary thrust of the letter was that plaintiff was charging higher prices than its competitors and that it was overreaching Hamlin by requiring payment on delivery. Following the statement that Hamlin "refused to be blackmailed, extorted or gouged," defendant discusses plaintiff's refusal to make deliveries on credit. This description of plaintiff's policy qualifies the offending language and demonstrates that defendant was criticizing plaintiff's business decision rather than accusing it of criminal activity. See *Parker v. Kirkland* (1939), 298 Ill. App. 340, 18 N.E.2d 709; see also *Krass v. Froio* (1975), 24 Ill. App. 3d 924, 322 N.E.2d 67.

Plaintiff's complaint and motion for summary judgment charged only that defendant's remarks imputed to plaintiff the commission of a felony. At trial and in its brief, however, plaintiff has argued that the letter accuses it of despicable business practices, and that such charges would severely prejudice plaintiff in the conduct of the trade or business. Notwithstanding plaintiff's failure to raise this contention earlier, we believe that defendant's comments do not fall within the class of words tending to prejudice a party in its trade or profession.

■■ ■ Since no question of personal reputation is involved where a plaintiff is a corporation, the alleged defamation must assail the corporation's financial position or business methods, or accuse it of fraud or mismanagement. (*Life Printing & Publishing Co. v. Field* (1944), 324 Ill. App. 254, 58 N.E.2d 307.) It is clear, however, that opinions and judgments of a party may be harsh, critical or even abusive, yet still not subject the writer to liability. (*Sloan v. Hatton* (1978), 66 Ill. App. 3d 41, 383 N.E.2d 259.) Viewing the defendant attorney's comments within the attendant circumstances, it is reasonable to conclude that defendant's language essentially amounted to criticism of plaintiff's policy decision regarding

prices and delivery of goods to Hamlin rather than an impugning of plaintiff's business reputation. See *Korbar v. Hite* (1976), 43 Ill. App. 3d 636, 357 N.E.2d 135, *cert. denied* (1977), 434 U.S. 837, 54 L. Ed. 2d 98, 98 S. Ct. 127.

Since statements capable of innocent construction must be so read, we find that the trial court erred in holding that the letter constituted libel per se. In view of our holding, it is unnecessary to address the other issues raised by defendant.

For the reasons stated, the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

SIMON, P. J., and RIZZI, J., concur.